UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

03 JUL -3 AM 11: 08

U.S. DISTRICT COURT
N.D. OF ALABAMA

JEROL TYSON,                      ]
                                  ]
          Plaintiff(s),           ]
                                  ]
     vs.                          ]       CV-02-CO-800-E
                                  ]
CITY OF TALLADEGA,                ]
                                  ]
          Defendant(s).           ]
                                  ]

MEMORANDUM OF OPINION



ENTERED

JUL C 5 2003

I.   INTRODUCTION.

     Presently before the court is a motion for summary judgment,
filed by the defendant on April 9, 2003 [Doc. # 51], as well as a
motion to strike, filed by the defendant on May 9, 2003 [Doc. #
56]. Upon due consideration, the court is of the opinion that the
motion to strike is due to be granted in part and denied in part,
and the motion for summary judgment is due to be granted.

II.  FACTS.[1]

     Plaintiff Jerol Tyson ("Mr. Tyson") is a thirty-eight year old
African-American male. He applied for a position as a correctional
officer or a police officer with defendant City of Talladega ("the
City") on February 9, 1999. After being interviewed by Harold

---

[1] The facts set out below are gleaned from the parties' submissions of facts
claimed to be undisputed, their respective responses to those submissions, and the
court's own examination of the evidentiary record. All reasonable doubts about the
facts have been resolved in favor of the nonmoving party. See Info. Sys. & Networks
Corp. v. City of Atlanta, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the
"facts" for summary judgment purposes only. They may not be the actual facts. See
Cox v. Adm'r U.S. Steel & Carnegie Pension Fund, 17 F.3d 1386, 1400 (11th Cir.
1994).



Robinson ("Mr. Robinson"), the Chief Correctional Officer for the City, and Captain Hawkins of the Talladega Police Department, Mr. Tyson was hired in July 1999, as a jailer for the City. Since January 2000, there have been eleven correctional officers hired by the City; seven of those were African-Americans, and four were Caucasians.

As a jailer, Mr. Tyson was supervised by Mr. Robinson, who had the authority to discipline Mr. Tyson for day to day infractions related to his job duties. However, the ultimate authority for termination rested at all times with the Chief of Police; Mr. Robinson never had the authority to terminate Mr. Tyson.

The first sixty days of Mr. Tyson's employment were considered a probationary period. During that time, he received positive evaluations from Mr. Robinson. However, shortly thereafter, Mr. Tyson's performance declined and Mr. Robinson reprimanded him for poor performance. Specifically, Mr. Tyson was reprimanded for paperwork errors on several occasions from late 1999 until October 2000.

In May 2000, Mr. Tyson observed Officer Harrison, a white Talladega Police Officer, use what Mr. Tyson considered to be excessive force against inmate Fred Benjamin ("inmate Benjamin"). Mr. Tyson alleges that he intervened, telling Officer Harrison that the inmate had not resisted arrest and should therefore not be beaten. In response, Officer Harrison stated "listen, boy, you

better keep your ass out of our fucking business." (I Tyson Dep. 111.) Another officer, Marco Williams, told Mr. Tyson "listen, boy, if you have any problems with someone kicking someone's ass in here, you tell me. You don't have a damn thing to do with what my boys do. You can call the SCLC or any other black organization you want to call." (*Id.* at 111-12.) Officer Williams then said to the other officers, "let's ride, boys," and the officers left the jail at that time. (*Id.* at 112.) Mr. Tyson testified that he found the use of the word "boy" directed at him to be offensive; however, he noted that none of the officers in question touched him or threatened him physically during that incident.

Mr. Tyson alleges that he complained about this incident to Mr. Robinson, who told him that inmate Benjamin "deserved to be beaten" and that "all blacks love to stay in jail." (I Tyson Dep. 132.)

The City jail has a combination safe with a drop box in which the jailers deposit inmates' money when they are booked. The safe was installed prior to the hiring of Mr. Tyson. Mr. Robinson and Correctional Officer Olson, Mr. Robinson's second-in-command, are the only two individuals who know the combination to the safe. At some point during his employment with the City, possibly in October 2000,[2] Mr. Tyson booked inmate Frank Graham ("inmate Graham"). Mr.

---

[2] Mr. Tyson's answers to interrogatories indicate that this event may have happened in October 2000.

Robinson told Mr. Tyson that inmate Graham accused him of stealing his money by failing to drop it in the safe when he was being booked. Once Mr. Tyson had been cleared of any wrongdoing with respect to inmate Graham's money, Mr. Tyson asked Mr. Robinson why he was not permitted to know the combination to the safe, to which Mr. Robinson replied that he "didn't trust blacks with the safe." (I Tyson Dep. 196.)

In addition to the allegations above, Mr. Tyson alleges that at some point during his employment with the City, Mr. Tyson called Officer Kevin Green to help him with an inmate who was having seizures. After coming to assist Mr. Tyson, Officer Green told him "If you call me down here again, I'm going to fire you; I don't care if the inmate dies." (Pl.'s Resp. to Interrog. No. 6(b)). On another occasion, when some inmates were getting unruly, Mr. Tyson called Officer Bonner for assistance. Officer Bonner did not immediately respond, and Mr. Tyson got the situation under control himself. Eventually, Officer Bonner responded to the scene and stated that he just came down to make sure Mr. Tyson was not "getting his ass kicked." (*Id.*) When Mr. Tyson responded that Officer Bonner needed to ensure that Mr. Tyson was not in any danger, Officer Bonner asked Mr. Tyson to step outside so he could "kick [Mr. Tyson's] ass." (*Id.*)

In late 2000, inmate Angela Grimes ("inmate Grimes") accused Mr. Tyson of sexual misconduct. During the investigation into the

allegations, Mr. Tyson was placed on paid administrative leave. Inmate Grimes's allegations could not be substantiated, and she in fact later recanted, stating that Mr. Robinson asked her to falsify allegations against Mr. Tyson.[3]

During the investigation into the Grimes incident, a number of allegations relating to Mr. Tyson's performance surfaced. Specifically, it was alleged that Mr. Tyson allowed unsupervised visits to inmates, allowed non-approved food into the jail, sold food to inmates, left security doors unlocked, allowed conjugal visits to some female inmates, took female inmates behind closed doors, obtained personal information such as addresses and phone numbers of female inmates, and failed to complete paperwork. A letter detailing these charges was given to Mr. Tyson, and an administrative hearing was held. Chief Watson decided to terminate Mr. Tyson based on the allegations stated above; however, a subsequent hearing was held before Chief Watson, and he decided to reinstate Mr. Tyson because Mr. Robinson had failed to follow proper procedures in documenting Mr. Tyson's disciplinary problems. Mr. Tyson lost no pay as a result of his first termination.

Mr. Tyson was present when inmate William Darnell ("inmate Darnell")[4] was being booked in March 2001. Mr. Tyson perceived the

---

[3] Nothing in inmate Grimes's statement indicates that Mr. Robinson's motivation for asking her to falsify these allegations was related to any racial animus towards Mr. Tyson.

[4] Inmate Darnell is referred to as both Darnell and Darnett. The court will refer to him as Darnell.

officers booking inmate Darnell to be using excessive force, and he intervened. He was told by Officer Pettus to mind his own business, and according to inmate Darnell, Officer Pettus said to Mr. Tyson "you fucking nigger; we are going to take care of you after we take care of this boy . . . you nigger is going down, do not get involved in our business."[5] (Darnell Aff.) Mr. Tyson experienced chest pains and went to the hospital, where no problems were noted.

After being released from the hospital, Mr. Tyson saw a psychiatrist at Alabama Psychiatric Services, who took Mr. Tyson off work for medical reasons due to the stress of his job. While still off work at the City, Mr. Tyson began to work for the City of Brighton as a police officer on March 14, 2001, and he received an unconditional release back to work from Alabama Psychiatric Services on March 28, 2001. Mr. Tyson failed to inform the City of his release back to work.

During the time that Mr. Tyson was off work, Chief Watson attempted on two occasions to speak with Mr. Tyson about when he would be able to return to work. Additionally, Chief Watson sent Mr. Tyson written notices to appear for hearings on March 18, 2001, and March 26, 2001. By late March 2001, Chief Watson had learned through an investigation by the City's worker's compensation carrier that Mr. Tyson had been working for the City of Brighton

---

[5]Interestingly, Mr. Tyson did not testify as to this particular statement, nor does he allude to it in any of his submissions to the court.

while he was on sick leave from the City of Talladega. Mr. Tyson failed to appear for either of the hearings before Chief Watson.

Mr. Tyson filed a charge of discrimination with the EEOC in April 2001, and he was terminated from his job with the City on May 7, 2001.[6] Having completed all administrative prerequisites to suit, Mr. Tyson filed the instant action on March 29, 2002. [Doc. # 1, Compl.] Mr. Tyson alleges two claims against the City:[7] (1) a hostile work environment claim based on racial harassment, asserted under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17, and (2) a retaliation claim under Title VII. The instant motion for summary judgment was filed on April 9, 2003.

III. STANDARD.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it

---

[6] The City admits that it knew of the EEOC charge before it terminated Mr. Tyson.

[7] Mr. Tyson purports to state three claims; however, his first two claims both allege a racially hostile work environment due to racial harassment. Additionally, the parties briefed a failure to hire claim based on the City's failure to hire Mr. Tyson as a police officer. However, it is clear that the complaint does not contain such a claim. Therefore, the court will consider only two claims: the harassment claim and the retaliation claim.

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

IV. DISCUSSION.

A.   Motion to strike.

The defendant has moved to strike the affidavits of William E. Darnell, Jr., and Eddie Tucker. The grounds for the motion as to

William E. Darnell, Jr., are that the affidavit includes inadmissible hearsay and makes conclusory statements about the mental impressions of others. Specifically, the affidavit relays the following statement Officer Pettus made to Mr. Tyson: "You fucking nigger; we are going to take care of you after we take care of this boy . . . you nigger is going down, do not get involved in our business." (Darnell Aff.) The affidavit also states that Mr. Tyson "appeared scared and intimidated by the officer's words." (*Id.*)

As for the allegation of hearsay, the court concludes that the statement to which inmate Darnell testified is not hearsay within the contemplation of the Federal Rules of Evidence. The statement is not offered to prove the truth of the matter asserted – that Officer Pettus planned to "take care of [Mr. Tyson] after [he took] care of" Darnell – but rather to establish that Officer Pettus made that statement. As such, it is not hearsay within Federal Rule of Evidence 801(c).

Moreover, the defendant's argument that inmate Darnell's statement that Mr. Tyson appeared scared is inadmissible and due to be stricken is unavailing. Under Federal Rule of Evidence 602, a witness may testify only as to those matters about which "the witness has personal knowledge." Fed. R. Evid. 602. If inmate Darnell had testified that Mr. Tyson was scared, that would be outside his personal knowledge; however, as a witness to the scene,

he is perfectly capable of testifying as to how Mr. Tyson appeared to him. Thus, the defendant's motion to strike is due to be denied as to the affidavit of inmate Darnell.

Similarly, the defendant makes a number of allegations to support its position that the affidavit of Eddie Tucker ("Mr. Tucker") is due to be stricken, including that it contains hearsay, is not based upon personal knowledge, and draws conclusions based upon the mental impressions of others. Mr. Tucker, a member of the Talladega City Council, testified in his affidavit that he was present at the administrative hearings regarding Mr. Tyson's employment. His affidavit recounts those proceedings, and gives some statistical evidence about the City's employment practices. The court concludes that to the extent Mr. Tucker offered, as proof of the matters asserted therein, statements made by other individuals at the administrative hearings, the motion to strike is due to be granted. Additionally, the motion to strike is due to be granted as to Mr. Tucker's conclusory allegations that "The City of Talladega has a pattern and practice of racial discrimination and harassment. There has been numerous complaints and filings of people (mostly black) being beaten at the City Jail," and "Most blacks who have jobs in City government have been threatened with termination in order to keep them quiet about racial discrimination and harassment," as there is no specific evidence in the record to support these conclusory statements. However, Mr. Tucker's

statistical testimony about the racial make-up of the police force in the City satisfies the requirements of Federal Rule of Civil Procedure 56(e) that affidavits "be made on personal knowledge, . . . set forth such facts as would be admissible in evidence, and . . . show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). As such, the motion to strike is due to be denied as to those portions of the affidavit.

      B.   Motion for summary judgment.

         1.   Racial harassment claim.

Title VII states that it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Racial harassment is a form of race discrimination prohibited by Title VII. *See Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 65-66 (1986).

To support a hostile environment claim under Title VII based on harassment, the plaintiff must establish:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome . . . harassment; (3) that the harassment must have been based on the [race] of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) a basis for holding the employer liable.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999) (en banc). The plaintiff can establish the fifth element in one of two ways, based on the identity of the alleged harasser or harassers. An employer will incur vicarious liability, subject to the availability of an affirmative defense, where the hostile environment was created by a supervisor with immediate or higher authority over the plaintiff. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002). However, where the perpetrator of the harassment is merely a co-employee of the victim, the employer will be held liable only if the plaintiff establishes that the employer knew or should have known of the harassing conduct but failed to take prompt remedial action. *Miller*, 277 F.3d at 1278. The plaintiff can do so by showing either actual knowledge on the part of the employer or conduct sufficiently severe and pervasive as to constitute constructive knowledge to the employer. *Id.* Mr. Tyson alleges a hostile environment comprised of both the statements of his supervisor, Mr. Robinson, and the statements of one or more of his co-workers. Because they require a different analysis, the court will consider these sets of allegations separately.

a.   Co-worker harassment.

Mr. Tyson alleges two incidents of alleged harassment perpetrated by his co-workers: the comments by co-workers Officers Harrison and Williams at the time inmate Benjamin was booked in May

2000, and the March 2001 comment of co-worker Officer Pettus in connection with the booking of inmate Darnell.[8] As stated above, these comments are actionable only if Mr. Tyson establishes that his employer knew or should have known about the harassing conduct but failed to take prompt remedial action. *Miller*, 277 F.3d at 1278. Mr. Tyson has not adduced any evidence to suggest that his employer knew or should have known about the alleged harassment he suffered at the hands of his co-workers. As such, these comments, while offensive, cannot be the basis for a hostile environment claim against the City.

       b.    Supervisor harassment.

As for the alleged harassment perpetrated by Mr. Robinson, Mr. Tyson alleges two incidents: Mr. Robinson's May 2000, comment that blacks like to stay in jail, and Mr. Robinson's October 2000 comment that he could not trust blacks with the safe.[9] Because the City will be vicariously liable for any harassing behavior attributable to Mr. Tyson's supervisor, the court must determine whether Mr. Tyson can prove the first four elements of his claim of

---

[8] Although Mr. Tyson alleges some other allegedly harassing incidents that occurred at work, such as the incidents with Officers Green and Bonner, *see supra* II, at 4, these incidents cannot fairly be described as related in any way to Mr. Tyson's race. *See Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000) ("[T]he statements and conduct must be of a [race]-related nature . . . before they are considered in determining whether the severe or pervasive requirement is met.").

[9] To the extent that Mr. Tyson alleges Mr. Robinson's involvement in the falsifying of sexual misconduct charges against Mr. Tyson supports his claim for racial harassment, the court concludes that this incident is a discrete act, rather than an incident of harassment. *See Morgan*, 536 U.S. at 115 ("Hostile environment claims are different in kind from discrete acts."). Moreover, there is no evidence to suggest that this incident was based in any way on Mr. Tyson's race.

racial harassment with respect to the allegations concerning Mr. Robinson's conduct.

A number of courts have noted that it is the fourth element – that the conduct complained of was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment – that "tests the mettle of most . . . harassment claims." *See, e.g., Gupta*, 212 F.3d at 583. This element has both a subjective and an objective component. "Accordingly, a plaintiff must establish not only that [he] subjectively perceived the environment as hostile and abusive, but also that a reasonable person would perceive the environment as hostile and abusive." *Gupta*, 212 F.3d at 583. The court has no doubt that Mr. Tyson perceived the environment to be hostile and abusive; therefore, the court must determine whether this subjective perception was objectively reasonable.

The Supreme Court has stated that to constitute an actionable hostile environment, the workplace must be "permeated with 'discriminatory intimidation, ridicule, and insult.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The Eleventh Circuit examines the evidence in light of four factors to determine whether the alleged harassment is sufficiently severe and pervasive to alter the plaintiff's terms or conditions of employment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3)

whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246. Under the factors enumerated above, the court is of the opinion that although the comments made by Mr. Robinson are offensive and appalling, considered in combination, they simply do not rise to the level of actionable racial harassment.

Specifically, with respect to the question of the frequency of the conduct, the court concludes that two stray comments over a period of several months do not establish that Mr. Tyson's workplace was "permeated with . . . 'insult'" so as to invoke the protection of Title VII. *Morgan*, 536 U.S. at 116. As to the second element – the severity of the alleged conduct – the court concludes that the comments alleged, though infrequent, were somewhat severe. However, in light of the remaining factors, the severity of the comments alone cannot support a finding of severe and pervasive harassment under Title VII.

With respect to the third factor, the court notes that the comments Mr. Tyson complains of, while admittedly offensive and abhorrent in modern society, were not of a physically threatening nature at all, but were merely offensive utterances. Finally, Mr. Tyson has not established that the fourth factor – that the harassment interfered with his job performance – weighs in favor of his claim of harassment. Although the evidence suggests that as a

result of the stress he experienced working for the City, he had to be off work for part of the month of March 2001, this fact alone, in light of the dearth of evidence to support the other factors, does not establish that Mr. Tyson's workplace was "permeated with . . . 'insult.'" *Morgan*, 536 U.S. at 116. Finding that Mr. Tyson cannot establish that he suffered harassment so severe and pervasive as to alter the conditions of his employment, the court concludes that no reasonable factfinder could find that Mr. Tyson was subjected to unlawful racial harassment in violation of Title VII. As such, summary judgment as to this claim is due to be, and will be, granted.

        2.   Retaliation claim.

Mr. Tyson alleges that he was terminated on May 7, 2001, in retaliation for filing a charge of discrimination with the EEOC. To establish a prima facie case of retaliation, the plaintiff must show: (1) that he engaged in statutorily protected expression; (2) that he suffered an adverse employment action; and (3) that there is some causal relationship between the two events. *EEOC v. Reichhold Chems., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993). The Eleventh Circuit reads the causation requirement very broadly: "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Reichhold Chems.*, 988 F.2d at 1571-72. Once the plaintiff establishes a prima facie case of retaliation, the employer must

proffer a legitimate, non-discriminatory reason for the adverse employment action. *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994). The burden then shifts back to the plaintiff to demonstrate that the employer's proffered explanation is a pretext for retaliation. *Meeks*, 15 F.3d at 1021.

It is clear that Mr. Tyson can establish the first two elements of his prima facie case; he engaged in protected expression when he filed his EEOC charge in April 2001, and he was terminated on May 7, 2001. Moreover, given that the City admits it knew of the filing of the EEOC charge before Mr. Tyson was terminated, and given the temporal proximity between the filing of the charge and Mr. Tyson's termination, the court assumes, without so holding, that Mr. Tyson can establish the third element of his prima facie case.

However, the City has proffered two legitimate, non-discriminatory reasons for Mr. Tyson's termination: Mr. Tyson failed to respond to Chief Watson's requests for information about when he would be returning to work, and Mr. Tyson began working for the City of Brighton while he was on sick leave from the City of Talladega. Mr. Tyson has offered no evidence to suggest that these reasons were not, in fact, the City's real reasons for terminating him, nor has he adduced any evidence to indicate that retaliation was the real reason he was terminated. Therefore, the court concludes that no reasonable factfinder could determine that the

reasons proffered by the City were mere pretext for retaliation. As such, the defendant is entitled to summary judgment on this claim.

V.   CONCLUSION.

In sum, the court concludes that the motion to strike is due to be granted in part and denied in part, while the motion for summary judgment is due to be granted in all respects. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this _____ of July, 2003.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

F:\WPDOCS\Coogler\Cases-Civil\CV-02-N-0800-E\Tyson v. Talladega, CV-02-CO-800-E, opinion on motion for summary judgment.wpd